The 4th District Appellate Court of the State of Illinois has now convened. The Honorable Craig H. D. Armon presiding. Good afternoon, Counsel. The next case is 4-21-0503, People of the State of Illinois v. Derek Crawford. Could Counsel for the Appellant please state your name for the record? Yes, Your Honor. This is Gregory Peterson of the Office of the State Appellate Defender. Thank you, Counsel. Counsel for the Appellate, could you please state your name for the record? Courtney O'Connor. Thank you. Mr. Peterson, you may proceed. Thank you, Your Honor, and may it please the Court. As just stated, I'm Gregory Peterson of the Office of the State Appellate Defender. I'm here on behalf of Derek Crawford. In late March of 2020, three shootings occurred. The shootings share a common motive. They share a common set of players. But there are key differences between them. At trial in this case, concerning only that first shooting, the State presented extensive evidence about the second and third shooting. But the differences between those shootings and the first one are insufficient to prove Mr. Crawford was involved in the first shooting, as opposed to the second and third. And the link between the two that the State offered, an eyewitness identification, was feeble and uncertain in a way that had changed by the time of trial. We don't deny here that by the time of trial, Markeisha Bolden's testimony and identification of Mr. Crawford was unequivocal. It was forceful. It was emphatic. But that's not what happened when they showed her the lineup. And when that conviction, those convictions were entered, Mr. Crawford was then sentenced based on a sentencing range that is flatly unconstitutional under both the Illinois Constitution and the federal Constitution. I intend to present argument on both of those today, but especially focusing on the sentencing issue. So beginning with reasonable doubt, with the sufficiency of the evidence, what the State's evidence at trial suggested is that Mr. Crawford's phone was with him when he conducted illegal conduct, when he traded drugs for the use of a vehicle. And it was with him three days later when he was involved in illegal conduct shootings that there the evidence included Snapchat videos that Mr. Crawford took with his friend flashing gun in the backseat. But the phone, a key part of this case that conclusively places Mr. Crawford at the site of these two uncharged shootings, was exactly where it should have been, was exactly where he should have been during the first shooting. The evidence essentially portrayed Mr. Crawford as careful, but only in the middle of a string of conduct over a period of days. If his phone was away from him for the first shooting, it would have been away from him for the second and third shootings as well. It would have been away from him for the pickup of the car. What we also see in the second and third shootings, which again are not charged in this case, is we see carelessness, we see frankly brashness on the part of this group of young men. Some young men, some boys admittedly. They're posting videos. They're bragging about it. They want exactly, not only they're willing to risk detection, they're looking for detection. They're looking to stamp their names on the second and third shootings. None of that's present in the first shootings. What we have here is a group of six potential offenders, six potential suspects. The only link that says that it wasn't just any of those six, but it was specifically Mr. Crawford, is Markeisha Bolton's eyewitness identification. And there, when she was presented with six photographs, the first thing she said is, this is all you have? There's not another sheet? Second thing she said was, well, five of these men don't look familiar at all, but he does. And that's after the officer administering the identification had told her, had read her a form specifically saying that the suspect could or could not be on there. But he'd also casually, off the cuff, in an explanation of how this really works, told her, you can assume he's on there. Given that Ms. Bolton and Mr. Crawford... You know, I've listened to you misstate the record now for the last several minutes. And I've kind of reached the point now where I think I just have to say something. You know that's not what the officer said. Either state what the record reflects, or just avoid it completely. Your Honor, the direct quote from the officer, I am loading it up now to make sure that I say it exactly, but I believe it is, you can assume the suspect's on there. If I'm misstating the record here, it's not intentional. The suspect, I assume, is on those, is his words. The suspect, I assume? Yes. Not, you can assume. Your statement is, you can assume he's on there. The guy who just said, I don't have anything to do with this case. I don't know anything about this case. Who's already admonished her that he may or may not be. In an off-the-cuff comment, off-script, says, I can assume. I assume he's on there. But he's not telling her, he's not directing her that you can assume he's on there. I understand, Your Honor. There's a significant distinction between those two statements. Your Honor, I don't mean that you can assume in the sense of you specifically, Marge Keisha Bolden. I mean in the sense of one can assume. It can be assumed. I don't mean any distinction between the I assume and the you can assume. And I do also want to be upfront about the fact that he did read her the instructions as well. Both before and after. Yes. And I don't mean to imply that the officer said that he knew any details about the case either. But Ms. Bolden would be working under the assumption that the officer knows how these procedures work in general. Because there's evidence of her doing a lot of photo lineups in the past? Not of her, but of him. Of the officer. And there isn't evidence of that. But I know that if I were in her position, I would assume that the police officer administering the lineups, that this is part of his regular duties. I've got you off your point and I apologize. No, thank you for bringing that up, Your Honor. I did not mean to put any particular emphasis on the you there. But that is the link there. Her initial, this guy looks familiar. The others don't look familiar. That's what the identification was right after the fact. And by trial, and she also, when she picks out the picture of Mr. Crawford, she says that it's the eyes that look familiar. By trial, that's the eyebrows. That's the entire face. So what we have here is her recognition of this photo in the moment where she says he's familiar. And we have on the record that they're actually somewhat distantly, but they are related. Their families know each other. And this becomes certainty by trial. This becomes her picking out specifically his bushy eyebrows. And this is the thing that we have another witness at trial, Troy Johnson, testifying that only his eyes were visible, that the eyebrows wouldn't have even been showing. And by trial, she's saying. Isn't this the kind of conflict that you'd be totally on solid ground to argue to a jury? What is it you're arguing that connects to an issue on appeal? Your Honor, I do agree that this is more persuasive to a jury than on appeal. But I do not think this satisfies Jackson versus Virginia. I think what we have here is convincing evidence proving beyond a reasonable doubt that my client was present at the second and third shootings. And what we have here are two convictions for the first shooting. The one that there's evidence showing that he was involved in the pickup of the car. And there was evidence showing that he was still hanging out with his friends two or three days later when illegal conduct was occurring. But it's only the eyewitness identification that places him actually at the scene on that day. And that is insufficient under Jackson versus Virginia. But I do also especially want to focus here on what happened next, what happened after those convictions were entered. Because Mr. Crawford was sentenced based on a flatly unconstitutional range. In order to give the plain language of this sentencing statute, it's meaning that it was clearly written that way unintentionally. To be fair to you, and I don't mean to be cutting off your argument. But I think that is a very persuasive argument, and I don't think you need to spend that much time on that one. Thank you, Your Honor. Without focusing then on whether the statute is unconstitutional, I would like to present our argument on the effect and the remedy there. Because to some extent, I know that Your Honor is not bound by the state's concession. That part is relevant. Yes. So what do we do if we decide that we should be following Johnson? Following Johnson, which I believe the state and I agree is the best approach, means that the range here should have been 6 to 60. And Mr. Crawford has a right to be sentenced by a judge that considers the nature and circumstances of the offense, the history and characteristics of him, and the maximum and minimum sentence the legislature has applied to that. Now, I do acknowledge that Johnson did not need this kind of analysis. Mr. Johnson's sentence was in the unconstitutional range. But here, the minimum and maximum sentences available are an important part of the trial judge's decision. And they naturally influence things. At the same time, I do want to say, if Judge Asher's intention here was regardless of the range, as long as 30 was permissible, 30 is the right number for her, remanding for resentencing will allow her to do that again. But she should do that with reference to the correct range. And I think... Well, but there's clearly a consecutive sentence based on the finding of problems of injury. So her sentences are actually well within the normal range of sentences, aren't they? Yes, Your Honor. They're 30 out of 12 to 60 total instead of 30 out of a 12 to 120 total. And as I explained, as I ran the numbers in my opening brief, that's 30 in a 12 to 120 is the equivalent of 20 in a 12 to 60. It's five times... It's easier to look at in terms of a 6 to 30, and she gives them 15. If that's an easier way to look at it, the numbers are the same. Is that if it's 6 to 60... Wouldn't we have to have some evidence that she relied on that extended term sentence in some fashion? You don't, Your Honor. And we see that from Marecki's. We see that from Owens. We see this from a huge line of cases, admittedly none from this district of the appellate court. But a huge line of cases saying that the wrong sentencing range, that's not only error, but that's second-pronged plain error right there. This sentencing decision, the minimum and the maximum available, they naturally influence the way the judge thinks. In my reply brief, for instance... Let me ask this question. I think it's fair to assume you haven't been a trial judge. That's correct, Your Honor. All three of us have for quite some time, if you add up all our time together. I don't think you can just assume that just because somebody's aware of what an extended term is, that that somehow affects your decision-making. The question is, what evidence is there in this record to indicate that that somehow affected this judge's decision? You're making a blanket assumption. If there's an extended term reference, that somehow then taints the judge's thinking. And I don't think any one of the three of us is going to look at that and go, yeah, you know what, he's right. No, it doesn't. Mr. Peterson, isn't your approach essentially assuming judges make sentence decisions in percentages of the maximum rather than in years? Some mix of the two, Your Honor. And we don't know on this record what was happening, which is why I'm asking, for instance, for resentencing and not asking this court for a flat reduction to 20. 20 is the same on percentages. This record leaves open the possibility that Judge Asher did want 30 total as a raw number as opposed to a place in the range. And that's why we're asking for remand. That's the decision that she's vested with, and we'd like her to make it based on the correct information. Did the state, the defense, or the court ever reference extended term sentencing at the sentencing hearing? No, Your Honor. But when they calculated the range in this case, I've seen in some records, for instance, where a sentencing range is described as 6 to 30, and then if extended term sentencing is found, 30 to 60. The first time I'm reading here from page 5 of the report of proceedings, it's characterized as a 6 to 60 right there, all one range. So we don't have a case, for instance, where we can assume that the judge rejected extended term sentencing as… Characterized by whom? Characterized by the state and then adopted by Judge Asher. And it was Judge Asher at that early hearing, not an associate judge of the court. And then this is repeated, I believe it's three times, but it's all before trial. At sentencing, they all worked from what they decided earlier, which is 6 to 60, even though Mr. Wyckoff, even though trial counsel chafed a bit at the statute, it looked wrong to him. They were all fully in agreement as to what the statute actually said. Which is why the rationale of Johnson makes sense. But the question is, as far as the remedy, without any indication that anybody referenced extended term sentencing at sentencing, when the trial court imposes a sentence well within the range of sentences and gives the defendant credit for the various mitigating factors that she did, how are we supposed to then impose our judgment on her decision and say, now, just because there was a reference to extended term earlier, we have to remand it for resentencing? I don't think you would be imposing your judgment over hers about a reference, Your Honor. I think it's that the wrong range was calculated. The range was characterized not as 6 to 30 and then maybe more. The range was calculated as 6 to 60 on each count. Is that true of all the admonishments in the record? The defendant was not admonished 6 to 30 with potential extended term to 60? I believe it's three total times. And the second time it's phrased as 6 to 30, but actually 6 to 60 because of extended term. But the first time it's 6 to 60. The last time before trial, it's everything we've already said holds at 6 to 60. Also, at sentencing, the state asks for 30 on the count involving Ms. Bolden alone. The state asks for something that under the proper range would be a maximum sentence. And it doesn't need to characterize that as a maximum sentence because everyone's working off of the wrong range. This is something where, in reality, what happened was the state, under the proper range, the state asked for the maximum on that count and the defense asked for the minimum and the judge picked somewhere in the middle. Counsel, if I'm agreeing, in a sense, to your argument, what's the best authority for the court to send this back down? Because in light of the fact that there is arguably proper admonishment, we're all within the normal range, not extended, wasn't referenced in sentencing. How do I support that decision? I think you follow Marecki's, Your Honor. That case, extended term, wrongly considered eligible. Sentence is within the normal range. In Marecki's, both the state and defense counsel referenced defendant's extended term eligibility at the sentencing hearing. Yes, Your Honor, but I don't think that's a distinction that actually matters here. Because here, the understanding from the start was 12 to 20 years of total exposure if convicted. But Marecki's, it's a forfeited by counsel and it was reached as plain error. It's extended term, but like this case, a sentence that was within the proper range. It's similarly a case where remanding for resentencing appropriately vests the chosen sentence to the discretion of the trial court without condoning the behavior involved or anything like that. It's factually on point. The state in its brief said, and now I'm going to distinguish Marecki's on its facts and then didn't. And that's because you can follow Marecki's perfectly. Well, how can it be factually like this case when both the defense and the state reference extended term sentencing at the sentencing hearing? I guess then what I'm saying, Your Honor, is I don't consider that to be a distinction that changes things. I don't think there was any doubt in the state and the parties in the court's minds at sentencing what range they were working with. I think that was something that they not necessarily litigated earlier, but they took a moment. They took a recess. They looked over the statute together. They determined that that range was available, and they came back. And I think it's a reasonable conclusion from the record as a whole that that decision was viewed as, to some extent, the law of the case, to some extent, just a decision that had been made and didn't need to be re-referenced. So it's a situation where I believe we just lost Justice DeArmond. I apologize. We lost our Internet completely. We lost a clerk at the same time, Your Honor, so it wasn't just you. It took a while to get back. So I'm sorry to mess up your train of thought, Mr. Peterson. I think we were right about the two-minute warning when I disappeared. So please go ahead and proceed. Thank you, Your Honor. And I just have a few points to finish with. Really, I'd like to focus in on this idea of does the trial court choose a number that is right in general, or does the trial court choose a point in the range? I'd like to focus on what I cited in my reply brief about different sentencing classes being available. Five years in a 3-7 range versus five years in a 4-15 range is a very different feel. And if we had evidence on this record of Judge Asher saying this isn't about the range, 15 is the right number for each count here, I don't think I would be raising this argument before you. But we don't know. And if 15 years on each count is the correct number, full stop, to Judge Asher, she should be given an opportunity within the constitutionally correct range to say so. But if there are no further questions, I'll rest on that and the arguments expressed in my brief. All right. Thank you, Mr. Peterson. You will have an opportunity in rebuttal. Counsel for the appellate, you may proceed. Thank you. May it please the court, counsel. The state would ask that this court affirm the defendant's convictions and sentences. We would stand greatly in our brief here, however, just emphasizing that this is a case that there's a clear identification of the victim. We have an officer who gave the proper admonishments before and after the photo array, and the victim stating that the only one she recognized was the defendant in this case. And then she made that clear during her testimony that she was supposed to identify who she recognized as the shooter who was face-to-face with her when he shot her. And I think this is clear on the record in her testimony that she remembers his eyes and that that was the man who shot her. And she still remembers that that was him after she received surgery for the multiple bullet wounds. I think the evidence in this case is pretty clear that it was the defendant in the shooting as well as the other shootings. And as our brief does say, the state does concede as to the second argument. However, we argue that it does not need to go on remand because his sentences still fall within the normal sentencing range. I don't think there's anything in the record that is clear that the judge in that case was arguably influenced by the incorrect sentencing ranges. I mean, she gave two 15-year sentences and in a 6- to 30-year range. I think she went right down the middle. I mean, that's pretty clear from the record. And we would stand by that. And as I said, the state would rely on its brief here, Your Honors. I don't think this is a case that we're unaware of who the victim is in this case or the suspect is in this case. From the evidence that's provided, the state was able to prove beyond a reasonable doubt that on March 28, 2020, the defendant provided Ms. Potter with drugs, proceeded to take her vehicle to Seven Pines and stare the victim, Ms. Bolden, directly in the eyes and shot her multiple times. And there's a clear identification by the victim that it was the defendant who shot her. As I said, the state would just ask this court to affirm the convictions and sentences. Thank you. Thank you, Counsel. Mr. Peterson. Now that I'm off mute, Your Honor, without conceding any of the points on the sufficiency argument, I would like to continue focusing on the sentencing here. And I'd particularly like to focus on what the state just said. The trial court went down the middle. Went down the middle of what? There's no doubt in this case that the range was calculated incorrectly. And the trial court didn't go down the middle of the range that the trial court thought was in existence. As previously expressed, the trial court picked a sentence five times closer to the minimum of the calculated range than to the maximum of the calculated range. Yes, Your Honor. With respect to my recce's, shouldn't we be looking to the Supreme Court and people versus Eddington? Didn't the Supreme Court essentially take that same approach and say, you know, if there's nothing nothing here showing that the trial court relied on the inaccurately stated range, it's not it's not reversible. Your Honor, I'll admit that I'm not 100 percent familiar with the facts of Eddington at this time. But what I would say is if we focus in on what Meraki's, for instance, says the actual error is, I'm reading from Meraki's. I believe it's page 484 of that decision because the record suggests the trial court erroneously believed the defendant was eligible for extended term sentencing. We vacate the sentence and remand. So the error is the belief in the incorrect range. I do agree if we had clear evidence that the trial court had disregarded the extended term range. If we had a statement, as often happens from trial courts, I don't believe an extended term sentence is appropriate here, followed by the calculation of a number. I believe this would be in a different situation than we are. I have a question right on that very point. Courts would normally make a finding that the extended term is appropriate. It seems to me when you argued earlier that the court was right in the middle, I agree with you, the court was right in the middle of a potential sentence within the appropriate range. Do you get where I'm going with that? I do to some extent, Your Honor. I think I've seen courts some explicitly rule out extended term, and I've seen some explicitly find it. Yeah, but I guess just right there, so I'm clear because my question was inartful. You'd expect a court to make a finding as to why an extended term would be part of the sentence, but in not having an extended term, the court may not feel that it's necessary to do so. And what would be the harm in that? I never felt any compunction to do so as a trial judge, so maybe you can enlighten me. Your Honor, I think this comes back to the way the range was phrased from the very start as 6 to 60 on each count as opposed to 6 to 30 with a potential 30 to 60 above that. And I have seen some trial judges view it as two ranges, and I have seen some trial judges view it as all of one. And here, the phrasing being from the very start 6 to 60 shows us the way things were characterized in Judge Asher's mind, and then nowhere in the rest of this very extensive record does she divert from that. It's a 6 to 60 range, so I'm asking this court to remand so that the court can consider the proper range, but then the court can balance all the factors the way it chooses. It's the trial court's discretion. The trial court should be given the correct range and allowed to work within that. How much time passed between the last reference to extended term sentencing and the sentencing? About three months, Your Honor. I believe the jury waiver hearing and the hearing that was mostly about other crimes evidence occurred in May of 2021, and then it was a mid-August sentencing. So the first reference happens in April of 2020, but the last reference to extended term sentencing and to that 6 to 60 range, it's about three months before sentencing. Thank you. Are there no further questions? All right. Thank you very much, counsel. And again, I apologize for the mix-up here. The court will take this matter under advisement. The court stands in recess.